144 F.3d 1205
 98 Cal. Daily Op. Serv. 3793, 98 Daily Journal
D.A.R. 5235
WOLSEY, LTD., a Hong Kong corporation, Plaintiff-Appellee,
v.
FOODMAKER, INC., a Delaware corporation; Foodmaker
International Franchising, Inc., a Delaware
corporation, Defendants-Appellants.
 No. 96-56345.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 5, 1997.
Decided May 19, 1998.
 
 J. Anthony Sinclitico, III, Alan B. Lawhead, Jeffrey L. Mengoli, Gibson, Dunn & Crutcher, L.L.P., San Diego, California, for defendants-appellants.
 Dennis O'Dorisio, Lynn E. Wedell, R. Craig Zafis, Urquhart, O'Dorisio & Wedell, San Diego, California, for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of California; William B. Enright, District Judge, Presiding. D.C. No. CV-96-634-E JFS.
 Before: BEEZER, THOMPSON, and O'SCANNLAIN, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 In this suit to compel arbitration, we must examine the interplay between federal and state law in the application of a contract's arbitration clause.
 
 
 2
 * In February of 1991, Foodmaker International ("Foodmaker"), a franchiser of Jack in the Box fast food restaurants, entered into a Development Agreement with Wolsey, Ltd. ("Wolsey"), a Hong Kong corporation, which gave Wolsey the right to develop Jack in the Box restaurants in Hong Kong and Macau for five years. The Development Agreement established a three-step dispute resolution process to be used for all disputes between Foodmaker and Wolsey: (1) a senior executive officer meeting; (2) non-binding arbitration under the rules of the American Arbitration Association; and (3) litigation in federal court.
 
 
 3
 In March of 1994, Wolsey invoked the dispute resolution procedure in the Development Agreement. Wolsey alleged that it had been fraudulently induced to enter into the Development Agreement by the express and implied misrepresentations of various Foodmaker executives that, if Wolsey successfully opened Jack in the Box restaurants in Hong Kong, Foodmaker would give Wolsey similar development rights to expand into China and extend Wolsey's development term in Hong Kong. Wolsey maintains that Foodmaker's president, Robert J. Nugent, conspired with Ta-Tung "Tony" Wang and QSR Management Company Limited ("QSR"), Wang's family owned company, to prevent Wolsey from developing restaurants in Asia so that QSR could develop the area itself.
 
 
 4
 After an unsuccessful meeting of the companies' senior executives in May 1994, Wolsey submitted the dispute to the American Arbitration Association. Wolsey asserted the following claims in the arbitration: (1) breach of contract; (2) breach of contract by hindrance of performance; (3) constructive fraud; (4) fraud in the inducement; (5) breach of the covenant of good faith and fair dealing; (6) interference with prospective economic advantage; (7) interference with contract; (8) breach of fiduciary duty; (9) unfair trade practices; and (10) unfair competition. After limited discovery and two weeks of arbitration, a Final Award of Arbitrators was issued in December of 1995. The panel determined Wolsey to be the prevailing party and rendered an award providing for various forms of relief, including an extension of Wolsey's development term for seven years and $200,000 for attorneys' fees.
 
 
 5
 Foodmaker declined to comply with the arbitration award. In April of 1996, Wolsey filed a complaint in federal court. In the complaint, Wolsey asserted claims for violations of the Lanham Act, the California Franchise Investment Law, and the Rackateer Influenced and Corrupt Organizations Act ("RICO"), none of which was asserted in the arbitration.[1]
 
 
 6
 Arguing that Wolsey's complaint asserted claims not advanced in the arbitration, Foodmaker moved to compel arbitration of those claims against the arbitration defendants.[2] The district court denied the motion, and Foodmaker filed a timely appeal. We have jurisdiction over an appeal from an order denying a motion to compel arbitration under 9 U.S.C. § 16(a)(1)(C).
 
 II
 
 7
 Section 19.3 of the Development Agreement between Wolsey and Foodmaker provides that "[e]xcept as provided in Section 19.2 hereof [pertaining to injunctions against Wolsey], all controversies, disputes or claims ... shall be submitted for non-binding arbitration." Foodmaker seeks to compel such arbitration pursuant to section 4 of the Federal Arbitration Act ("FAA"), which allows a party to an arbitration agreement to "petition any United States district court ... for an order directing that ... arbitration proceed in the manner provided for in [an arbitration] agreement." 9 U.S.C. § 4.
 
 
 8
 As a threshold matter, Wolsey maintains that the FAA does not apply to non-binding arbitration such as that provided for in the Development Agreement.[3] The FAA does not specifically define the term "arbitration." In arguing that the FAA does not apply to non-binding arbitration, Wolsey relies on Section 2 of the Act, which provides:
 
 
 9
 A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
 
 
 10
 9 U.S.C. § 2 (emphasis added). Wolsey maintains that a provision in a contract to submit a controversy to non-binding arbitration is not a provision to "settle" a controversy. However, Wolsey's reliance on the use of the word "settle" in Section 2 of the FAA does not get it far. Black's Law Dictionary defines "settle" as:
 
 
 11
 A word of equivocal meaning; meaning different things in different connections, and the particular sense in which it is used may be explained by the context or surrounding circumstances. Accordingly, the term may be employed as meaning to agree, to approve, to arrange, to ascertain, to liquidate, to come to or reach an agreement, to determine, to establish, to fix, to free from uncertainty, to place, or to regulate.
 
 
 12
 Black's Law Dictionary 1230 (5th ed.1979).
 
 
 13
 Although the Ninth Circuit has never addressed whether the FAA applies to non-binding arbitration, other courts have. In AMF Inc. v. Brunswick Corp., 621 F.Supp. 456 (E.D.N.Y.1985), Judge Weinstein examined whether a contract containing a non-binding agreement to arbitrate was covered by the Act. Judge Weinstein observed:
 
 
 14
 Case law following the passage of the [Federal Arbitration] Act reflects unequivocal support of agreements to have third parties decide disputes--the essence of arbitration. No magic words such as "arbitrate" or "binding arbitration" or "final dispute resolution" are needed to obtain the benefits of the Act. See City of Omaha v. Omaha Water Co., 218 U.S. 180, 194, 30 S.Ct. 615, 616, 54 L.Ed. 991 (1910) (dictum) ("a plain case of the submission of a dispute or difference which had to be adjusted ... was in fact an arbitration, though the arbitrators were called appraisers").
 
 
 15
 . . . . .
 
 
 16
 Arbitration is a creature of contract, a device of the parties rather than the judicial process. If the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration.
 
 
 17
 Id. at 460 (emphasis added).
 
 
 18
 More recently, the Third Circuit adopted a slightly narrower definition of "arbitration" for purposes of the FAA in Harrison v. Nissan Motor Corp., 111 F.3d 343 (3rd Cir.1997). In Harrison, the court examined whether the informal dispute resolution procedure provided by a manufacturer pursuant to the Pennsylvania Automobile Lemon Law, 73 P.S. § 1951 et seq. (Purdon 1993), and the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., qualified as "arbitration" under the FAA. The court characterized arbitration as follows:
 
 
 19
 Although it defies easy definition, the essence of arbitration, we think, is that, when the parties agree to submit their disputes to it, they have agreed to arbitrate these disputes through to completion, i.e. to an award made by a third-party arbitrator. Arbitration does not occur until the process is completed and the arbitrator makes a decision. Hence, if one party seeks an order compelling arbitration and it is granted, the parties must then arbitrate their dispute to an arbitrators' decision, and cannot seek recourse to the courts before that time.
 
 
 20
 Id. at 350 (emphasis added). The Third Circuit concluded that the alternative dispute resolution process contemplated by the Pennsylvania Lemon Law was inconsistent with this view of arbitration. The court reasoned that, because the Pennsylvania Lemon Law permits a dissatisfied car owner to "seek recourse to the courts" if he has not received a decision from the "arbitrator" within forty days, the dispute resolution process established by the statute would not be "pursue[d] ... to completion in all cases," and therefore would not "constitute arbitration within the meaning of the FAA." Id. at 351.
 
 
 21
 According to Judge Weinstein's analysis, parties agree to submit to arbitration under the FAA when they "agree[ ] to submit a dispute for a decision by a third party." See AMF Inc., 621 F.Supp. at 460. In addition, according to the Third Circuit's analysis, the parties must not only agree to submit the dispute to a third party, but also agree not to pursue litigation "until the process is completed." See Harrison, 111 F.3d at 350. Neither the Third Circuit nor Judge Weinstein held that the arbitrators's decision must be binding for the FAA to apply. Judge Weinstein stated that "[t]he arbitrator's decision need not be binding in the same sense that a judicial decision needs to be to satisfy the constitutional requirement of a justiciable case or controversy," AMF Inc., 621 F.Supp. at 460, and the Third Circuit explicitly declined to address "the question whether the FAA applies to nonbinding arbitration in general." Harrison, 111 F.3d at 350.
 
 
 22
 We are persuaded that, under the reasoning adopted by these courts, the dispute resolution procedures established by section 19 of the Development Agreement between Wolsey and Foodmaker qualify as "arbitration" for purposes of the FAA. Section 19.3 of the Development Agreement provides:
 
 
 23
 Except as provided in Section 19.2 hereof [pertaining to injunctions against Wolsey], all controversies, disputes or claims ... shall be submitted for non-binding arbitration to the San Diego, California office of the American Arbitration Association on demand of either party. Such arbitration proceedings shall be conducted in Honolulu, Hawaii and, except as otherwise provided in this Agreement, shall be heard by three arbitrators in accordance with the then-current commercial arbitration rules of the American Arbitration Association.
 
 
 24
 Section 19.3 clearly provides for the submission of claims to "a third party." AMF Inc., 621 F.Supp. at 460. Moreover, unlike the Pennsylvania Lemon Law, the Development Agreement does not explicitly permit one of the parties to "seek recourse to the courts" after submitting claims for non-binding arbitration but before the "process is completed and the arbitrator makes a decision." Harrison, 111 F.3d at 350.
 
 
 25
 A final factor weighing in favor of viewing the dispute resolution procedures provided for by the Development Agreement as "arbitration" is the presumption in favor of arbitrability created by the FAA. The FAA was designed "to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate," Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 219-20, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), and to place such agreements "upon the same footing as other contracts," Scherk v. Alberto-Culver Co., 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess., 1, 2 (1924)). See also Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 270, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (noting that Congress passed FAA "to overcome courts' refusals to enforce agreements to arbitrate"). In Moses H. Cone Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the Supreme Court stated:
 
 
 26
 The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or the allegation of waiver, delay, or a like defense to arbitrability.
 
 
 27
 Id. at 24-25, 103 S.Ct. 927 (emphasis added). In light of the strong presumption in favor of arbitrability recognized in Moses H. Cone, we hold that arbitration need not be binding in order to fall within the scope of the Federal Arbitration Act. The FAA is no less applicable to the Development Agreement between Wolsey and Foodmaker than it would be if the parties had agreed to submit to binding arbitration.
 
 III
 
 28
 As the Supreme Court recognized in Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior Univ., 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), parties are free to enter into contracts providing for arbitration under rules established by state law rather than under rules established by the FAA. The Volt Court held that while "the FAA pre-empts state laws which require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration[,] ... it does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself." Id. at 478-79, 109 S.Ct. 1248 (internal quotations omitted). The Court further observed that "[w]here ... the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the Act would otherwise permit it to go forward." Id. at 479, 109 S.Ct. 1248. In other words, parties are free to contract around the FAA by incorporating state arbitration rules into their agreements.
 
 
 29
 Wolsey argues that the Development Agreement incorporates California's arbitration rules through the agreement's choice-of-law clause, which provides: "[T]his Agreement between Foodmaker International and [Wolsey] shall be interpreted and construed under the laws of the State of California, U.S.A." Unlike the FAA, California's arbitration rules grant courts the discretion to stay arbitration proceedings pending resolution of related litigation. Specifically, Cal.Civ.Proc.Code Ann. § 1281.2(c) provides that when a court determines that
 
 
 30
 [a] party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact[,] ... the court (1) may refuse to enforce the arbitration agreement and may order intervention or joinder of all parties in a single action or special proceeding; (2) may order intervention or joinder as to all or only certain issues; (3) may order arbitration among the parties who have agreed to arbitration and stay the pending court action or special proceeding pending the outcome of the arbitration proceeding; or (4) may stay arbitration pending the outcome of the court action or special proceeding.
 
 
 31
 Cal.Civ.Proc.Code Ann. § 1281.2(c).
 
 
 32
 It is undisputed that Wolsey is "[a] party to the arbitration agreement [who] is also a party to a pending court action ... with ... third part[ies QSR and Wang], arising out of the same transaction or series of related transactions," and that "there is a possibility of conflicting rulings on a common issue of law or fact." Therefore, if Cal.Civ.Proc.Code Ann. § 1281.2(c) was incorporated into the Development Agreement, as the district court concluded, it was within the district court's discretion to deny Foodmaker's motion to compel arbitration.
 
 
 33
 In construing an arbitration agreement, courts must "apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Under California contract law, the court must "endeavor[ ] to effectuate the mutual intent of the parties." City of El Cajon v. El Cajon Police Officers' Ass'n, 49 Cal.App.4th 64, 56 Cal.Rptr.2d 723, 727 (1996). The "paramount consideration" is "the parties' objective intention at the time of contracting." Porreco v. Red Top RV Center, 216 Cal.App.3d 113, 264 Cal.Rptr. 609, 612 (1989).
 
 
 34
 In deciding that the parties intended to incorporate California's procedural arbitration rules, including Cal.Civ.Proc.Code Ann. § 1281.2(c), into the Development Agreement, the district court relied on: (1) the textual proximity of the Development Agreement's arbitration clause and its choice-of-law clause, (2) an argument made in Foodmaker's brief during a discovery dispute before the arbitration panel, and (3) the arbitration panel's determination that the parties had agreed in the Development Agreement that California law would apply. In our view, none of these factors supports the district court's conclusion.
 
 
 35
 Prior to the arbitration hearing, Foodmaker and Wolsey disputed the scope of discovery allowed in a non-binding arbitration conducted under the rules of the American Arbitration Association. In a brief submitted to the arbitration panel, Foodmaker argued that the American Arbitration Association's rules require that the parties stipulate to any discovery in an arbitration proceeding. Foodmaker also argued that because the Development Agreement was to be interpreted under California law, which does not allow an arbitrator to order depositions in non-personal injury cases, no depositions should be permitted. The district court relied on Foodmaker's argument as evidence that the parties intended to apply California arbitration rules.
 
 
 36
 Under California law, "[t]he rule is well-settled that in construing the terms of a contract the construction given it by the acts and conduct of the parties with knowledge of its terms ... is admissible on the issue of the parties' intent." Southern California Edison Co. v. Superior Court, 37 Cal.App.4th 839, 44 Cal.Rptr.2d 227, 234 (1995). However, "this allowance is qualified by a restriction that actions to be considered occur before a dispute has arisen." Heston v. Farmers Ins. Group, 160 Cal.App.3d 402, 206 Cal.Rptr. 585, 591 (1984) (emphasis added); see also Warner Constr. Corp. v. City of Los Angeles, 2 Cal.3d 285, 85 Cal.Rptr. 444, 451, 466 P.2d 996, 1003 (1970) ("The principle of 'practical construction' applies only to acts performed under the contract before any dispute has arisen."). Here, a dispute had obviously arisen as to the terms of the Development Agreement before Foodmaker submitted its arbitration discovery brief; indeed, the brief was submitted while the parties were arbitrating their rights under the contract. Consequently, pursuant to § 1281.2(c), the district court should not have considered that brief in determining the meaning of the contract.
 
 
 37
 We are persuaded that the district court was also incorrect to rely on the ruling of the arbitration panel as evidence of the parties' intent to apply section 1281.2(c). As we noted earlier, under California contract law, the "paramount consideration" is "the parties' objective intention at the time of contracting." Porreco, 264 Cal.Rptr. at 612. A ruling of an arbitration panel is not evidence of the parties' intent at the time of contracting. Moreover, courts review de novo the meaning of an agreement to arbitrate. See Republic of Nicaragua v. Standard Fruit Co., 937 F.2d 469, 474 (9th Cir.1991).
 
 
 38
 Because the district court erred in relying on the arbitration discovery brief and the arbitration panel's ruling in determining that the Development Agreement incorporated Cal.Civ.Proc.Code § 1281.2(c), the question whether the district court was correct to deny Foodmaker's motion to compel arbitration turns on the propriety of applying state arbitration rules when a contract contains both an agreement to arbitrate and a general choice-of-law clause in the same section. In addressing this issue, we are guided by the Supreme Court's decision in Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995).
 
 
 39
 Mastrobuono involved the interpretation of a contract that was similar in many respects to the Development Agreement between Wolsey and Foodmaker. The Mastrobuono contract contained an arbitration provision and a choice-of-law provision in the same paragraph.[4] See id. at 58, 115 S.Ct. 1212. The first sentence of that paragraph provided that the entire agreement "shall be governed by the laws of the State of New York." Id. at 58-59, 115 S.Ct. 1212. The second sentence provided that "any controversy" arising out of the transaction between the parties "shall be settled by arbitration" in accordance with the rules of the National Association of Securities Dealers. Id. at 59, 115 S.Ct. 1212. Although the contract contained no express reference to punitive damages, the Seventh Circuit had interpreted the contract to incorporate New York law, including the rule established by the New York Court of Appeals in Garrity v. Lyle Stuart, Inc., 40 N.Y.2d 354, 386 N.Y.S.2d 831, 353 N.E.2d 793 (1976), that arbitrators may not award punitive damages. See id. at 54-55, 115 S.Ct. 1212 (citing Mastrobuono v. Shearson Lehman Hutton, Inc., 20 F.3d 713 (7th Cir.1994)).
 
 
 40
 The Supreme Court reversed. See Mastrobuono, 514 U.S. at 55, 115 S.Ct. 1212. The Court first focused its analysis on the contract's choice-of-law clause:
 
 
 41
 The choice-of-law provision, when viewed in isolation, may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes arising out of the contractual relationship. Thus, if a similar contract, without a choice-of-law provision, had been signed in New York and was to be performed in New York, presumably "the laws of the State of New York" would apply, even though the contract did not expressly so state. In such event, there would be nothing in the contract that could possibly constitute evidence of an intent to exclude punitive damages claims. Accordingly, punitive damages would be allowed because, in the absence of contractual intent to the contrary, the FAA would pre-empt the Garrity rule....
 
 
 42
 Even if the reference to "the laws of the State of New York" is more than a substitute for ordinary conflict-of-laws analysis and, as respondents urge, includes the caveat, "detached from otherwise-applicable federal law," the provision might not preclude the award of punitive damages because New York allows its courts, though not its arbitrators, to enter such awards. See Garrity, 40 N.Y.2d, at 358, 386 N.Y.S.2d at 834, 353 N.E.2d at 796. In other words, the provision might include only New York's substantive rights and obligations, and not the State's allocation of power between alternative tribunals. Respondents' argument is persuasive only if "New York law" means "New York decision law, including the State's allocation of power between courts and arbitrators, notwithstanding otherwise-applicable federal law." But, as we have demonstrated, the provision need not be read so broadly. It is not, in itself, an unequivocal exclusion of punitive damages claims.
 
 
 43
 Id. at 60, 115 S.Ct. 1212.
 
 
 44
 More important than the meaning of the choice-of-law clause or the arbitration clause alone, the Court held, was "the meaning of the two provisions taken together." Id. at 59, 115 S.Ct. 1212. The Court "disagree[d]" with the proposition that "the juxtaposition of the two clauses suggests that the contract incorporates 'New York law relating to arbitration.' " Id. at 62, 115 S.Ct. 1212. After observing that a contract "should be read to give effect to all its provisions and to render them consistent with each other," id. at 63, 115 S.Ct. 1212, the Court concluded:
 
 
 45
 We think the best way to harmonize the choice-of-law provision with the arbitration provision is to read "the laws of the State of New York" to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators. Thus, the arbitration provision covers the rights and duties of the parties, while the choice-of-law clause covers arbitration; neither sentence intrudes upon the other.
 
 
 46
 Id. at 63-64, 115 S.Ct. 1212.
 
 
 47
 Applying Mastrobuono, the Development Agreement between Foodmaker and Wolsey should not be read to incorporate Cal.Civ.Proc.Code Ann. § 1281.2(c). Like the contract in Mastrobuono, the Development Agreement contains an arbitration clause and a general choice-of-law clause, but does not contain a specific reference to the state arbitration rule at issue. Therefore, pursuant to Mastrobuono, the relevant question is whether section 1281.2(c) is a "substantive principle that [California] courts would apply" or is instead "a special rule[ ] limiting the authority of arbitrators." Id. at 64, 115 S.Ct. 1212. That is, it is necessary to determine whether section 1281.2(c) affects "only [California's] substantive rights and obligations," or whether it also affects "[California's] allocation of power between alternative tribunals." Id. at 63-64, 115 S.Ct. 1212. Section 1281.2(c) allows courts to stay arbitration proceedings where a party to the arbitration agreement is also a party to a pending court action with a third party arising out of the same transaction. Such a rule assuredly does affect California's "allocation of power between alternative tribunals." Mastrobuono, 514 U.S. at 64, 115 S.Ct. 1212.
 
 
 48
 In arguing that, despite the Supreme Court's recent decision in Mastrobuono, the Development Agreement should be read as incorporating Cal.Civ.Proc.Code Ann. § 1281.2(c), Wolsey relies heavily on the Supreme Court's earlier decision in Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior Univ., 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). Like the present case, Volt involved the applicability of Cal.Civ.Proc.Code Ann. § 1281.2(c) to a dispute over a contract that included both an arbitration provision and a general choice-of-law clause. See id. at 470, 109 S.Ct. 1248. The California Court of Appeal interpreted the contract to incorporate Cal.Civ.Proc.Code Ann. § 1281.2(c). See id. at 472, 109 S.Ct. 1248. Significantly, the Volt Court declined to review the California Court of Appeal's interpretation of the contract. See id. at 474, 109 S.Ct. 1248. The Supreme Court observed that "the interpretation of private contracts is ordinarily a question of state law, which this Court does not sit to review." Id. The Supreme Court in Volt restricted itself to addressing the question "whether, assuming the choice-of-law clause meant what the Court of Appeal found it to mean, application of Cal.Civ.Proc.Code Ann. § 1281.2(c) is nonetheless pre-empted by the FAA to the extent it is used to stay arbitration under this contract involving interstate commerce." Id. at 476, 109 S.Ct. 1248 (emphasis added).
 
 
 49
 Unlike the Volt Court, which declined to review a state court's interpretation of a private contract, we must interpret the Development Agreement between Wolsey and Foodmaker. In Mastrobuono, the Supreme Court distinguished Volt as follows:
 
 
 50
 The dissent makes much of the similarity between this choice-of-law clause and the one in Volt, which we took to incorporate a California statute allowing a court to stay arbitration pending resolution of related litigation. In Volt, however, we did not interpret the contract de novo. Instead, we deferred to the California court's construction of its own state law. 489 U.S., at 474, 109 S.Ct., at 1253 ("the interpretation of private contracts is ordinarily a question of state law, which this Court does not sit to review"). In the present case, by contrast, we review a federal court's interpretation of this contract....
 
 
 51
 Mastrobuono, 514 U.S. at 60 n. 4, 115 S.Ct. 1212 (1995). Thus, in interpreting the Development Agreement, we are bound by Mastrobuono, not by Volt. Because Mastrobuono dictates that general choice-of-law clauses do not incorporate state rules that govern the allocation of authority between courts and arbitrators, the district court erred in applying Cal.Civ.Proc.Code Ann. § 1281.2(c) to deny Foodmaker's motion to compel arbitration.
 
 IV
 
 52
 We reverse the district court's denial of Wolsey's motion to compel arbitration and remand for further proceedings consistent with this opinion.
 
 
 53
 REVERSED and REMANDED.
 
 
 
 [1]
 The complaint was filed not only against Foodmaker, but also against Foodmaker officers Jack Goodall and Robert Nugent and Foodmaker director Kenneth Williams, none of whom was a party to the arbitration. However, on February 5, 1998, Wolsey voluntarily dismissed with prejudice its claims against Goodall, Nugent, and Williams pursuant to Federal Rule of Civil Procedure 41(a)(1)
 
 
 [2]
 The district court later dismissed Wolsey's California Franchise Investment Law claim and its RICO claim, both with prejudice. Wolsey filed a motion for reconsideration of the district court's order dismissing its RICO claim, but the motion was denied. Therefore, Wolsey's Lanham Act claim is the only remaining claim that was not asserted in the arbitration
 
 
 [3]
 The district court apparently assumed without deciding that the dispute resolution procedures provided for in the Development Agreement qualified as "arbitration" for purposes of the FAA
 
 
 [4]
 In the Development Agreement between Wolsey and Foodmaker, the arbitration provision is contained in section 19.3, whereas the choice-of-law provision is contained in section 19.9