[No. A096018. First Dist., Div. Three. Aug. 28, 2002.]

MOUNT DIABLO MEDICAL CENTER, Plaintiff and Respondent, v. HEALTH NET OF CALIFORNIA, INC., Defendant and Appellant.

**COUNSEL**

Pillsbury Winthrop, John M. Grenfell, Shawn Hanson and Matthew P. Vandall for Defendant and Appellant.

Hooper, Lundy & Bookman, Inc., Glenn E. Solomon and Mark Johnson for Plaintiff and Respondent.

**OPINION**

**POLLAK, J.**—We confront what one commentator has characterized as "the thorny question of contract construction raised by the generic choice-of-law clause" in an agreement calling for the resolution of disputes by arbitration.[1] Appellant Health Net of California, Inc. (Health Net) appeals from the denial of its petition to compel arbitration of the claims of respondent Mount Diablo Medical Center (Mt. Diablo) and to stay the litigation in which Mt. Diablo asserts those claims. The trial court denied the petition under Code of Civil Procedure section 1281.2, subdivision (c) (hereafter section 1281.2(c)), finding that the arbitration would create a risk of rulings that conflict with rulings in pending litigation involving third parties. Health Net contends the clause choosing California law in the contract between the parties does not evince an intention to render their agreement to arbitrate subject to the terms of the California Code of Civil Procedure, so that section 1281.2(c) has been preempted by the Federal Arbitration Act, 9 United States Code section 1 et seq. (FAA), and that the federal statute requires that the arbitration agreement be enforced despite the potential for conflicting results. The trial court read the choice-of-law provision more broadly and therefore rejected this contention. We interpret the authorities on the subject to require the court to look first to the language of the contract to determine what portions of state law the parties intended to incorporate, and then, if any ambiguity exists, to determine whether the provision in question conflicts with the objectives of the FAA. Under this approach, we conclude that the parties intended to incorporate California procedural law governing the enforcement of their agreement to arbitrate, and that these provisions are not preempted. Therefore we affirm.

### Factual and Procedural Background

The relevant facts are not controverted. Mt. Diablo is an acute care hospital located in Concord, California. As of June 1, 1995, it entered into a

---

[1] Note, *An Unnecessary Choice of Law: Volt, Mastrobuono, and Federal Arbitration Act Preemption* (2002) 115 Harv. L.Rev. 2250, 2251 (*An Unnecessary Choice of Law*).

"fee-for-service" agreement, entitled the "Health Net Per Diem Hospital Agreement for Mt. Diablo Medical Center" (Health Net/Mt. Diablo Agreement), with Health Net, a health care service plan,[2] under which Health Net agreed to pay Mt. Diablo specified fees for providing health care services to plan members.[3] As contemplated by the Health Net/Mt. Diablo Agreement, effective January 1, 1998, Health Net entered into a "third party payor capitation agreement" with Alta Bates Medical Center (Alta Bates) (the Health Net/Alta Bates Agreement), under which Alta Bates agreed to be responsible for providing medical services to Health Net plan members on the basis of capitated or prepaid rates, as distinguished from fee-for-service rates, with the understanding that Alta Bates would subcontract its obligations to individual providers or hospitals such as Mt. Diablo. Alta Bates in turn had a preexisting "Hospital Participation Agreement" with Mt. Diablo, under which Mt. Diablo agreed to provide covered services at the capitated rates to Health Net members who selected the Alta Bates network of providers. As of May 1, 1999, Mt. Diablo purported to terminate its Hospital Participation Agreement with Alta Bates.

The underlying controversy relates to who is responsible and in what amounts for services that Mt. Diablo rendered to Health Net members after the termination of the Hospital Participation Agreement. Mt. Diablo's complaint asserts several causes of action against Health Net and Alta Bates, and also against East Bay Medical Network (EBMN), which is the processing agent for Alta Bates, and against PacifiCare of California (PacifiCare), another health care service plan with which Mt. Diablo and Alta Bates had contractual arrangements similar to those with Health Net and with which a similar controversy exists. The complaint alleges, among other things, that Health Net breached the Health Net/Mt. Diablo Agreement by failing to pay Mt. Diablo at the fee-for-services rate for hospital services rendered Health Net members between May 1 and December 31, 1999, and it also alleges that Alta Bates and EBMN breached an oral agreement to pay these same amounts to Mt. Diablo. The complaint alleges breach of implied contract, open book account, quantum meruit, and unjust enrichment claims against all of the defendants.

The Health Net/Mt. Diablo Agreement contains a broad arbitration agreement, which unquestionably encompasses the present controversy between

---

[2]Health Net is a health care service plan licensed under the Knox-Keene Health Care Service Plan Act of 1975, Health and Safety Code section 1340 et seq., and is qualified to do business under the federal Health Maintenance Organization Act of 1973, 42 United States Code section 300e et seq.

[3]The Health Net/Mt. Diablo Agreement was amended in 1998 and was renewed annually until it was terminated on December 31, 1999.

these two parties.[4] The agreement also contains a separate provision concerning choice of law, which reads in relevant part: "The validity, construction, interpretation and enforcement of this Agreement shall be governed by the laws of the State of California." The Health Net/Alta Bates Agreement and the Hospital Participation Agreement also contain arbitration provisions, but no party other than Health Net has attempted to resolve any aspect of the present controversy through arbitration, nor has any attempt been made to arbitrate Mt. Diablo's similar claim against PacifiCare.

After being served with Mt. Diablo's complaint, Health Net filed a petition to compel arbitration of the dispute. Mt. Diablo opposed the petition on the ground that its claim against Health Net overlapped its claims against Alta Bates and EBMN, and that the court should exercise its discretion under section 1281.2(c) to refuse to compel arbitration because of the potential for inconsistent rulings if the controversy were adjudicated in multiple forums. Mt. Diablo argued that because its agreement with Health Net provided for the application of California law, section 1281.2(c) rather than the FAA, which gives the court no discretion to deny arbitration on this ground, applies. (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468 [109 S.Ct. 1248, 103 L.Ed.2d 488] (*Volt*).) The trial court denied the petition on this basis, ruling that "(a) the Supreme Court's decision in [*Volt*] is controlling; (b) the parties to the arbitration agreement expressed a clear intent to incorporate the California Rules of Arbitration (Code of Civil Procedure section 1281, et. seq.) into their agreement through a general California choice-of-law clause; and (c) allowing arbitration to proceed would create a risk of conflicting rulings as described in . . . section 1281.2(c)."

Health Net has timely appealed the denial, as it may do under Code of Civil Procedure section 1294, subdivision (a). On appeal, it does not dispute the manner in which the trial court exercised its discretion under section 1281.2(c), but it contends that the choice-of-law provision in the Health Net/Mt. Diablo Agreement should not be interpreted to call for the application of section 1281.2(c). Therefore, it argues, the FAA has preempted this

[4]Section 10.01 of the Health Net/Mt. Diablo Agreement provides in relevant part: "Arbitration Between Parties. In the event of any dispute arising out of or relating to this Agreement, the parties shall first attempt in good faith to resolve the dispute mutually between themselves. If unable to do so, then all matters in controversy shall be submitted, upon motion of either party, to arbitration under the appropriate rules of the American Arbitration Association ('AAA'). All such arbitration proceedings shall be administered by the AAA; however, the arbitrator shall be bound by applicable state and federal law, and shall issue a written opinion setting forth findings of fact and conclusions of law. The parties agree that the decision of the arbitrator shall be final and binding as to each of them."

provision of California law and the court was required to enforce the arbitration provision. As the parties agree, this issue presents a question of law subject to de novo review by the appellate court. (*24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1212 [78 Cal.Rptr.2d 533].)

## *Discussion*

Section 1281.2(c) authorizes the court to refuse to enforce a contractual arbitration provision if arbitration threatens to produce a result that may conflict with the outcome of related litigation not subject to arbitration. Section 1281.2 provides that on petition of a party to an arbitration agreement, the court shall order the parties to arbitrate the controversy "unless it determines that . . . [¶] . . . [¶] (c) A party to the arbitration agreement is also a party to a pending court action . . . with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact," in which case "the court (1) may refuse to enforce the arbitration agreement and may order intervention or joinder of all parties in a single action . . . ; (2) may order intervention or joinder as to all or only certain issues; (3) may order arbitration among the parties who have agreed to arbitration and stay the pending court action . . . pending the outcome of the arbitration proceeding; or (4) may stay arbitration pending the outcome of the court action . . . ."

The FAA, however, contains no similar provision. ▮ The federal statute was enacted in 1925 to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate" (*Dean Witter Reynolds, Inc. v. Byrd* (1985) 470 U.S. 213, 219-220 [105 S.Ct. 1238, 1242, 84 L.Ed.2d 158]), and to place arbitration agreements " 'upon the same footing as other contracts . . . .' " (*Scherk v. Alberto-Culver Co.* (1974) 417 U.S. 506, 511 [94 S.Ct. 2449, 2453, 41 L.Ed.2d 270].) ▮▮ It provides for the enforcement of arbitration provisions in any contract evidencing a transaction involving interstate commerce. (9 U.S.C. § 2.)[5] ▮ The modern era of Supreme Court interpretation of the FAA begins with *Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24-25 [103 S.Ct. 927, 941-942, 74 L.Ed.2d 765], in which the court held that the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay,

---

[5]Because the Health Net/Mt. Diablo Agreement requires, among other things, that Mt. Diablo provide medications and hospital supplies manufactured and distributed nationwide, the agreement at issue in this case involves interstate commerce. (*Summit Health, Ltd. v. Pinhas* (1991) 500 U.S. 322, 329-330 [111 S.Ct. 1842, 1847, 114 L.Ed.2d 366].)

or a like defense to arbitrability." However, the FAA leaves room for states to enact some rules affecting arbitration. (*Volt, supra,* 489 U.S. at p. 476 [109 S.Ct. at p. 1254]; Hayford & Palmiter, *Arbitration Federalism: A State Role in Commercial Arbitration* (2002) 54 Fla. L.Rev. 175 (Hayford & Palmiter).) State laws that apply to contracts generally can be applied to arbitration agreements, but "[c]ourts may not . . . invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." (*Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687 [116 S.Ct. 1652, 1656, 134 L.Ed.2d 902].) And the FAA "preempts a state law that withdraws the power to enforce arbitration agreements." (*Southland Corp. v. Keating* (1984) 465 U.S. 1, 16, fn. 10 [104 S.Ct. 852, 861, 79 L.Ed.2d 1].) The FAA gives the courts no discretion to refuse to order arbitration that has been agreed to by the parties. (*Dean Witter Reynolds Inc. v. Byrd, supra,* 470 U.S. 213.)

Despite the apparent inconsistency between section 1281.2(c) and the FAA, the United States Supreme Court gave its blessing to section 1281.2(c) in *Volt.* After pointing out that "[t]he FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration" (*Volt, supra,* 489 U.S. at p. 477 [109 S.Ct. at p. 1255]), the court concluded that "[a]rbitration under the [FAA] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate [citation], so too may they specify by contract the rules under which that arbitration will be conducted. Where . . . the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that the arbitration is stayed where the [FAA] would otherwise permit it to go forward." (*Id.* at p. 479 [109 S.Ct. at p. 1256].) The choice-of-law provision at issue in *Volt* specified that the contract " '. . . shall be governed by the law of the place where the Project is located,' " which was California. (*Id.* at p. 470 [109 S.Ct. at p. 1251].) By this choice-of-law provision, the California court had concluded that "the parties had incorporated the California rules of arbitration, including § 1281.2(c), into their arbitration agreement." (*Volt, supra,* at p. 472 [109 S.Ct. at p. 1252].) The Supreme Court held that the parties had thereby "agreed that arbitration would not proceed in situations which fell within the scope of [section 1281.2(c)]" (*Volt, supra,* at p. 475 [109 S.Ct. at p. 1253]) and that the FAA did not prevent application of this provision to stay the arbitration. (*Id.* at p. 477 [109 S.Ct. at p. 1255].) "[A]pplication of the California statute is not pre-empted by the [FAA] in a case where the parties have agreed that their arbitration agreement will be governed by the law of California." (*Id.* at p. 470 [109 S.Ct. at p. 1251].)

■ The parties are in essential agreement with these general propositions. Where they part company, however, is with respect to the interpretation of the choice-of-law provision in the Health Net/Mt. Diablo Agreement. Mt. Diablo points out that *Volt* itself arose out of an agreement subject to California law, but Health Net correctly observes that the United States Supreme Court did not express an opinion concerning the manner in which the choice-of-law clause should be interpreted, but felt itself bound to accept the interpretation of the California court that by the provision in that contract, the parties had agreed to arbitrate in accordance with California law. (See *Volt, supra,* 489 U.S. at p. 474 [109 S.Ct. at p. 1253].) Health Net urges this court to construe the present agreement differently. Relying on the Supreme Court's subsequent decision in *Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52 [115 S.Ct. 1212, 131 L.Ed.2d 76] (*Mastrobuono*), and federal cases that have followed it, Health Net argues that the "generic" choice-of-law provision was not intended to designate California arbitration law in preference to federal arbitration law for the interpretation and enforcement of the arbitration agreement. Absent an explicit choice of California law for this purpose, Health Net argues that federal law must apply.

The circumstances in *Mastrobuono* were very different from those involved in the present case. The issue there was whether to apply New York decisional law, which permitted punitive damages to be awarded by courts but not by arbitrators (the *Garrity* rule).[6] The plaintiffs argued that the *Garrity* rule was preempted by the FAA, while the defendants relied on *Volt* for the proposition that because the parties' arbitration agreement provided that the entire agreement " 'shall be governed by the laws of the State of New York,' " the *Garrity* rule should apply to the dispute. (*Mastrobuono, supra,* 514 U.S. at pp. 53, 58 [115 S.Ct. at pp. 1214, 1216-1217].) The court observed that "[t]he choice-of-law provision, when viewed in isolation, may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes arising out of the contractual relationship" (*id.* at p. 59 [115 S.Ct. at p. 1217]), that it "might include only New York's substantive rights and obligations, and not the State's allocation of power between alternative tribunals," and that it was not "in itself, an unequivocal exclusion of punitive damages claims" (*id.* at p. 60 [115 S.Ct. at p. 1217]). The court reiterated that the FAA was designed to overcome the refusal of many state courts to enforce arbitration agreements (*id.* at pp. 55-56, 58, 62 [115 S.Ct. at pp. 1215, 1216-1217, 1219-1220]) and found that because the arbitration provision there did not specifically address the powers to be conferred on the arbitrator or the availability

---

[6] *Garrity v. Lyle Stuart, Inc.* (1976) 40 N.Y.2d 354 [386 N.Y.S.2d 831, 353 N.E.2d 793, 83 A.L.R.3d 1024].

of punitive damages, "[a]t most, the choice-of-law clause introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards" (*id.* at p. 62 [115 S.Ct. at p. 1218]). Relying on the federal policy favoring arbitration, as well as the common law rule that a court should construe ambiguous contract language against the interest of the party that drafted it, the court concluded that the parties did not intend to incorporate the *Garrity* rule, so that punitive damages could be awarded by an arbitrator to the same extent they could be awarded by a court. (*Id.* at pp. 62-63 [115 S.Ct. at pp. 1218-1219].) "We think the best way to harmonize the choice-of-law provision with the arbitration provision is to read 'the laws of the State of New York' to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators." (*Id.* at pp. 63-64 [115 S.Ct. at p. 1219].)

The decisions in *Volt* and *Mastrobuono* have given rise to a good bit of commentary as well as criticism.[7] *Volt* was criticized because it ceded to the states authority to regulate the meaning and effect of contractual provisions concerning arbitrability that many had assumed was provided on a uniform national basis by the FAA. (See, e.g., Becker, *Choice of Law and the Federal Arbitration Act: The Shock of Volt* (1990) 45 Arb. J. 32.) *Mastrobuono* has been regarded by some as a first step in returning to the pre-*Volt* jurisprudence of "not allowing the inclusion of a choice-of-law provision to undermine the federal policy favoring arbitration." (Micheletti, *supra*, 21 Del. J. Corp. L. at p. 1058.) Others have questioned the precedential value of

---

[7]See, e.g., Hanzman, *Arbitration Agreements: Analyzing Threshold Choice of Law and Arbitrability Questions: An Often Overlooked Task* (1996) 70-DEC Fla. B. J. 14, 20-21 ("The message derived from these decisions is, in this author's opinion, clear. Generic choice of law provisions cannot be used to incorporate into an arbitration agreement state law which, in the absence of the choice of law provision, would be preempted by the FAA. But, as was the case in *Volt*, state procedural rules that do not undermine the enforceability of an otherwise valid contract to arbitrate may be deemed to have been incorporated into contracts through choice of law provisions"); Appel, *Mastrobuono v. Shearson Lehman Hutton, Inc.* (1996) 12 Ohio St. J. on Disp. Resol. 233, 239 (Appel) (the *Mastrobuono* court "engaged in very creative contract analysis to find ambiguity where none really existed"); Shell, *Federal Versus State Law in the Interpretation of Contracts Containing Arbitration Clauses: Reflections on Mastrobuono* (1996) 65 U. Cin. L.Rev. 43, 62 ("*Mastrobuono* demonstrates how the Supreme Court's ideological commitment to freedom of contract sometimes interferes with its ability to announce clear rules of law based on analytic conceptions of public policy."); see also Note, *An Unnecessary Choice of Law, supra,* 115 Harv. L.Rev. 2250; Hayford & Palmiter, *supra,* 54 Fla. L.Rev. 175; Diamond, *Choice of Law Clauses and Their Preemptive Effect on the Federal Arbitration Act: Reconciling the Supreme Court with Itself* (1997) 39 Ariz. L.Rev. 35, 56-58; Micheletti, *Mastrobuono v. Shearson Lehman Hutton, Inc.: Another Piece of the Federal Arbitration Act Policy Puzzle* (1996) 21 Del. J. Corp. L. 1027 (Micheletti); Note, *In Defense of Parties' Rights to Limit Arbitral Awards Under the Federal Arbitration Act: Mastrobuono v. Shearson Lehman Hutton, Inc.* (1996) 31 Wake Forest L.Rev. 309, 331- 332; Note, *Federal Arbitration Policy After Mastrobuono v. Shearson Lehman Hutton, Inc.* (1996) 32 Willamette L.Rev. 517, 534.

*Mastrobuono* (see *Mastrobuono, supra,* 514 U.S. at pp. 71-72 [115 S.Ct. at pp. 1222-1223] (dis. opn. of Thomas, J.), Appel, *supra,* 12 Ohio St. J. on Disp. Resol. 233; Trainor, *Mastrobuono v. Shearson Lehman Hutton, Inc.* (1996) 56 La. L.Rev. 1015, 1027-1028). All the while, lower courts have been struggling with the extent to which and the manner by which the incorporation of state law may be effectively accomplished. (Appel, *supra,* at pp. 239-240; Micheletti, *supra,* at p. 1057; see also *Wolsey, Ltd. v. Foodmaker, Inc.* (9th Cir. 1998) 144 F.3d 1205; *Roadway Package System, Inc. v. Kayser* (3d Cir. 2001) 257 F.3d 287, cert. den. (*Roadway Package*); *Gateway Technologies v. MCI Telecommunications* (5th Cir. 1995) 64 F.3d 993, 999 [*Mastrobuono* stands for the proposition that arbitrators have the power to award punitive damages unless the parties unequivocally state otherwise]; *Lanier v. Old Republic Ins. Co.* (M.D.Ala. 1996) 936 F.Supp. 839, 844 ["The court must admit the difference between the two cases, while there, is difficult to grasp"].)[8]

Among the numerous federal decisions that have considered the meaning of *Mastrobuono* and its relationship to *Volt,* the case that undoubtedly is most helpful to Health Net's position is *Wolsey, Ltd. v. Foodmaker, Inc., supra,* 144 F.3d 1205. Pointing out that the United States Supreme Court in *Volt* felt constrained to accept the interpretation of the California court that the choice-of-law provision in that agreement was intended to incorporate section 1281.2(c), the court in *Wolsey* stated that in the diversity case before it, the federal court was required to interpret the agreement for itself. Purporting to apply *Mastrobuono,* the *Wolsey* court felt that the "relevant question is whether section 1281.2(c) is a 'substantive principle that [California] courts would apply' or is instead 'a special rule[] limiting the authority of arbitrators." (*Wolsey, supra,* at p. 1212.) The Ninth Circuit Court of Appeals concluded that "[b]ecause *Mastrobuono* dictates that general choice-of-law clauses do not incorporate state rules that govern the allocation of authority between courts and arbitrators, the district court erred in applying . . . § 1281.2(c) to deny Foodmaker's motion to compel arbitration." (*Wolsey, supra,* at p. 1213.)

The court in *Roadway Package, supra,* 257 F.3d 287, 288, also a diversity case, interpreted another choice-of-law provision, this one reading that the

---

[8]Some courts have hinted that the key to reconciling *Mastrobuono* and *Volt* is that a different standard of contract interpretation may apply in federal courts proceeding under their diversity jurisdiction than in state courts. (See, e.g., *Chiron Corp. v. Ortho Diagnostic Systems, Inc.* (9th Cir. 2000) 207 F.3d 1126, 1131; *Wolsey, Ltd. v. Foodmaker, Inc., supra,* 144 F.3d at p. 1212.) However, the notion that the same contract may be interpreted differently depending on the court in which its meaning is adjudicated is at odds with *Erie R. Co. v. Tompkins* (1938) 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487] and would produce unacceptable uncertainty and unpredictability in determining the meaning of contracts.

agreement " 'shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.' " A divided panel of the Third Circuit Court of Appeals, in the interests of simplicity and uniformity, formulated a "default rule" that "a generic choice-of-law clause, standing alone, is insufficient to support a finding that contracting parties intended to opt out of the FAA's default standards." (*Id.* at pp. 295-296.)

In our view, the starting point in the interpretation of the choice-of-law clause, like any contractual provision, is with the language of the contract itself. While Health Net attempts to group all choice-of-law clauses that make no explicit reference to arbitration under the rubric "generic," the term has no precise definition. If by that term is meant a choice-of-law provision that states that the agreement will be governed by the law of a particular state without elaborating the specific provisions of state law to which it applies (see *Roadway Package, supra,* 257 F.3d at p. 303, fn. 2 (conc. opn. of Ambro, J.)),[9] and if such a "generic" provision is insufficient to incorporate the state's laws concerning the enforcement of arbitration agreements, re-quiring such a redundancy before the provision will have any effect "leads logically to the conclusion that other provisions . . . may also need to contain that redundant choice, *e.g.,* provisions treating indemnification rights or termination events in contracts involving the interstate transportation of products." (*Id.* at p. 308.) We agree with the observation of the concurring judge in *Roadway Package,* who rejected the approach that the FAA controls absent "extrinsic evidence of an intent to contract out of the FAA's default regime" (*id.* at p. 300) in favor of the traditional attempt to discern the intention of the parties, that "[t]he choice of law almost invariably is meant to encompass the entire agreement" (*id.* at p. 308).

The choice-of-law provision in the present case may be "generic" in the sense that it does not mention arbitration or any other specific issue that might become a subject of controversy, but it is nonetheless broad, unquali-fied and all-encompassing. It provides that "[t]he validity, construction, interpretation and enforcement of this Agreement" shall be governed by California law. The explicit reference to enforcement reasonably includes such matters as whether proceedings to enforce the agreement shall occur in court or before an arbitrator. Chapter 2 (in which § 1281.2 appears) of title 9 of part III of the California Code of Civil Procedure is captioned "Enforce-ment of Arbitration Agreements." An interpretation of the choice-of-law provision to exclude reference to this chapter would be strained at best.

---

[9]The concurring judge in that case pointed out, tongue in cheek, that the provision in *Volt* would need to be characterized as a "super-generic choice of law," since that provision referred to no particular jurisdiction, but only to the law of the place where the project was located. (*Roadway Package, supra,* 257 F.3d at p. 303, fn. 2.)

In contrast, the agreement in *Mastrobuono* provided only that it " 'shall be governed by the laws of the State of New York.' " (*Mastrobuono, supra,* 514 U.S. at p. 53 [115 S.Ct. at p. 1214].) In *Wolsey,* the contract provided that it " '. . . shall be interpreted and construed under the laws of the State of California, U.S.A.' " (*Wolsey, Ltd. v. Foodmaker, Inc., supra,* 144 F.3d at p. 1209.) The breadth of the provision in the Health Net/Mt. Diablo Agreement is emphasized by comparison with the provision that was involved in *Warren-Guthrie v. Health Net* (2000) 84 Cal.App.4th 804 [101 Cal.Rptr.2d 260] (*Warren-Guthrie*). In that case, the contract containing an arbitration agreement provided only that " '[a]ll Arbitration shall be *conducted* in accordance with the California Code of Civil Procedure, commencing with Section 1280' " (*Warren-Guthrie, supra,* at p. 815, italics added), and the court therefore held that the parties had not agreed that the enforceability of the arbitration agreement would be determined by California law. The court pointed out that there was "no express language indicating that California law shall . . . apply for all purposes," and that the agreement "limits the scope of California law to that law pertaining to the manner in which the arbitration is to be conducted." (*Ibid.*) Thus, although reaffirming that under *Volt* a petition to compel arbitration may be denied under section 1281.2 if the parties have agreed to the application of California law for this purpose (*Warren-Guthrie, supra,* at pp. 813-814), the court found that the limited purpose for which California law had been designated under that contract did not constitute such an agreement (*id.* at p. 816).

Several of the federal cases following *Mastrobuono* contain choice-of-law provisions that use language similar to that in *Mastrobuono* and *Wolsey,* to the effect that the agreement would be governed by the law of a particular jurisdiction, without reference to enforcement. (E.g., *Nat. Union Fire Ins. Co. v. Belco Petroleum Corp.* (2d Cir. 1996) 88 F.3d 129, 132 [" 'The construction, validity and performance of this policy shall be governed by the law of the State of New York, U.S.A.' "]; *Porter Hayden Co. v. Century Indem. Co.* (4th Cir. 1998) 136 F.3d 380 382 [" 'All disputes concerning the validity, interpretation and application of the Agreement . . . and all disputes concerning issues within the scope of the Agreement shall be determined in accordance with applicable common law of the states of the United States' "]; *UHC Management Co. v. Computer Sciences Corp.* (8th Cir. 1998) 148 F.3d 992, 994, 997 [" 'To the extent not preempted by ERISA or other federal law, this Agreement shall [be] governed by and construed under the laws of the State of Minnesota.' " "[T]the choice-of-law clause itself specifically provides that Minnesota law must yield whenever preempted by federal law, which cuts against the argument that the parties intended that the FAA not apply"].)

The significance of this difference in language is also reflected by the decision of the Court of Appeals of New York in *Smith Barney, etc. v. Luckie* (1995) 85 N.Y.2d 193 [623 N.Y.S.2d 800, 647 N.E.2d 1308]. In holding that the governing choice-of-law clause, which made no explicit reference to arbitration rules, nonetheless should be interpreted to include New York arbitration law rather than the FAA, the court emphasized that "the parties' choice that New York law would govern 'the agreement *and its enforcement*' (emphasis added) indicates their 'intention to arbitrate to the extent allowed by [this State's] law,' even if application of the State law . . . would relieve the parties of their responsibility under the contract to arbitrate." (*Id.* at p. 1313.) The chief judge concurred, also emphasizing that "because the form arbitration agreements at issue plainly provide that New York law governs 'the agreement *and its enforcement*' (emphasis added), the parties can fairly be understood to have agreed that all of New York arbitration law . . . would apply." (*Id.* at p. 1316 (conc. opn. of Kaye, C. J.).)

Health Net suggests that the clause in the arbitration provision of the present agreement that "the arbitrator shall be bound by applicable state and federal law" somehow qualifies the reference to California law in the choice-of-law provision. However, there is no inconsistency between these two paragraphs. The arbitration provision merely confirms that the arbitrator must adhere to applicable state and federal substantive law in resolving the merits of the controversy. The choice-of-law paragraph provides that issues of contract validity, interpretation and enforcement shall be governed by California law. Whether the court should compel compliance with the arbitration provision is a question of enforcement to be resolved under this agreement under California law. The reference to federal law in the arbitration provision does not indicate otherwise.

If the language of the choice-of-law clause is broad enough to include state law on the subject of arbitrability, as it unquestionably is in this case, the second step in the court's analysis, under *Mastrobuono*, must be to determine whether the particular provision of state law in question is one that reflects a hostility to the enforcement of arbitration agreements that the FAA was designed to overcome. If so, the choice-of-law clause should not be construed to incorporate such a provision, at least in the absence of unambiguous language in the contract making the intention to do so unmistakably clear. In *Mastrobuono* itself, the state law in question would have denied an arbitrator the ability to award the same relief as a court, and the Supreme Court held that the ambiguity in the contract should be resolved by reading the choice-of-law clause "not to include special rules limiting the authority of arbitrators." (*Mastrobuono, supra*, 514 U.S. at p. 64 [115 S.Ct. at p. 1219].)

Many of the cases cited by Health Net involved provisions which, like the New York rule in *Mastrobuono,* tended to restrict rather than to facilitate the use of arbitration, which was the reason the courts concluded that application of state law would contravene the FAA. (E.g., *Ferro Corp. v. Garrison Industries, Inc.* (6th Cir. 1998) 142 F.3d 926, 928, 936 [unlike California's § 1281.2(c), "the Ohio law does not relate to the efficient order of the proceedings, but rather determines conclusively which forum—arbitration or judicial—should entertain Ferro's defense of fraudulent inducement of the contract. As in *Doctor's Associates,* the application of Ferro's construction of the Ohio state law would lead the Court to effectively abrogate the arbitration agreement, *in toto,* rather than simply establish the efficient order of proceedings"]; *PaineWebber, Inc. v. Elahi* (1st Cir. 1996) 87 F.3d 589, 592, 601-602 [provision that " '[t]his agreement and its enforcement shall be construed and governed by the laws of the State of New York' " was not an expression of intent to adopt the New York law requiring the court, rather than the arbitrator, to apply time bar contained in the rules of the National Association of Securities Dealers, Inc.]; cf. *Nat. Union Fire Ins. Co. v. Belco Petroleum Corp., supra,* 88 F.3d at p. 135; *Porter Hayden Co. v. Century Indem. Co., supra,* 136 F.3d at p. 382.)

On the other hand, where the state arbitration provision is not inconsistent with the FAA policy of enforcing arbitration procedures chosen by the parties, choice-of-law clauses making no explicit reference to arbitration commonly have been interpreted to incorporate the state's law governing the enforcement of arbitration agreements. (E.g., *ASW Allstate Painting & Const. v. Lexington Ins.* (5th Cir. 1999) 188 F.3d 307, 310 [Texas choice-of-law clause required application of "Texas arbitration rules [that] do not undermine the federal policy of the FAA"]; *Ekstrom v. Value Health, Inc.* (D.C. Cir. 1995) 68 F.3d 1391, 1396 [under Connecticut choice-of-law provision, Connecticut arbitration rules that were consistent with goals of FAA applied]; *Flight Systems v. Paul A. Laurence Co.* (D.D.C. 1989) 715 F.Supp. 1125, 1127 [Virginia rules for vacating arbitration award applied because "[t]he parties contracted under the laws of Virginia, agreed to arbitration under the laws of Virginia, and the application of Virginia law does not directly conflict with the goals of the FAA."]; *Flexible Mfg. Systems PTY v. Super Products* (E.D.Wis. 1994) 874 F.Supp. 247, 249 [same re Wisconsin law].)

We disagree with the implicit determination in *Wolsey* that section 1281.2(c) is " 'a special rule[] limiting the authority of arbitrators' " (*Wolsey, Ltd. v. Foodmaker, Inc., supra,* 144 F.3d at p. 1212), as was the New York rule involved in *Mastrobuono.* This view contradicts the characterization of

section 1281.2(c) by the Supreme Court itself not only in *Volt* (*Volt, supra,* 489 U.S. at p. 476, fn. 5 [109 S.Ct. at p. 1254]) but in the subsequent decision in *Doctor's Associates, Inc. v. Casarotto, supra,* 517 U.S. 681. In rejecting a Montana statute requiring arbitration agreements to contain a particular form of notice in order to be enforceable, the Supreme Court contrasted that statute with section 1281.2(c): "The state rule examined in *Volt* determined only the efficient order of proceedings; it did not affect the enforceability of the arbitration agreement itself. We held that applying the state rule would not 'undermine the goals and policies of the FAA,' [citation], because the very purpose of the Act was to 'ensur[e] that private agreements to arbitrate are enforced according to their terms.' " (517 U.S. at p. 688 [109 S.Ct. at pp. 1656-1657]; see also, e.g., *Ferro Corp. v. Garrison Industries, Inc., supra,* 142 F.3d at pp. 928, 937.)

Section 1281.2(c) is not a provision designed to limit the rights of parties who choose to arbitrate or otherwise to discourage the use of arbitration. Rather, it is part of California's statutory scheme designed to enforce the parties' arbitration agreements, as the FAA requires. Section 1281.2(c) addresses the peculiar situation that arises when a controversy also affects claims by or against other parties not bound by the arbitration agreement. The California provision giving the court discretion not to enforce the arbitration agreement under such circumstances—in order to avoid potential inconsistency in outcome as well as duplication of effort—does not contravene the letter or the spirit of the FAA. That was the explicit holding in *Volt* and nothing in *Mastrobuono* casts doubt on that conclusion. Thus, there is no reason why the broad language of the choice-of-law clause in this case, calling for the enforcement of the agreement under California law, should not be read to invoke the provisions of section 1281.2(c).

Finally, we quickly dispose of Health Net's ultimate argument that even if section 1281.2(c) applies, that section does no more than authorize a stay of the arbitration proceedings, and does not authorize an order "to force Health Net to submit to litigation." In the first place, as the trial court's order quoted above makes clear, the order included no such compulsory provision. It merely denied Health Net's application to compel arbitration and to stay the litigation. Indeed, the court added a provision making the denial without prejudice in the event that Mt. Diablo settled its claims with Alta Bates and EBMC. The statute expressly authorizes the court, if the prescribed conditions apply, to "refuse to enforce the arbitration agreement," which is exactly what the trial court did. *Warren-McGuthrie* explicitly rejected Health Net's contention that section 1281.2 "does not support the proposition that denial of arbitration is also permissible where the parties agree to apply California

law." (*Warren-McGuthrie, supra,* 84 Cal.App.4th at p. 813.) Since the litigation will proceed, Health Net, having been brought within the court's jurisdiction, presumably will be bound by the outcome and undoubtedly will find it in its best interests to defend the litigation. However, that is not because the trial court has ordered anything beyond what the statute authorizes. Rather, it is the natural corollary of the reasons for which section 1281.2(c) has been included in the California statute, so that common issues of fact and law will be resolved consistently, and only once.

### Disposition

The order denying Health Net's petition is affirmed. Mount Diablo Medical Center shall recover its costs on appeal.

McGuiness, P. J., and Parrilli, J., concurred.