133 Cal.Rptr.2d 384 (2003)
107 Cal.App.4th 1308
CRONUS INVESTMENTS, INC., Plaintiff, Cross-Defendant and Appellant,
v.
CONCIERGE SERVICES, LLC, Defendant, Cross-Complainant and Respondent;
Westrec Marina Management, Inc., et al., Defendants and Respondents;
Howard Jon Colman, Cross-Defendant and Appellant.
No. B159591.
Court of Appeal, Second District, Division Four.
April 21, 2003.
Review Granted July 16, 2003.
*385 William A. Soroky, Woodland Hills; Rehwald Rameson Lewis & Glasner, William Rehwald, Lawrence M. Glasner and Daniel R. Chaleff, Woodland Hills, for Plaintiff, Cross-defendant and Appellant, and for Cross-defendant and Appellant.
Thomas J. Ready, San Francisco, for Defendant, Cross-complainant and Respondent, and for Defendants and Respondents.
CURRY, J.
Appellants challenge an order of the trial court denying their petition to compel arbitration. We affirm.

RELEVANT FACTUAL AND PROCEDURAL HISTORY
On March 19, 2002, appellant Cronus Investments, Inc. (Cronus), filed a complaint *386 against respondents Concierge Services, LLC (Concierge), Westrec Marina Management, Inc. (Westrec), Westrec Contracting, LLC, Michael M. Sachs, William W. Anderson, and Michael P. Robbins. The complaint asserted claims for breach of contract, breach of fiduciary duty, conversion, and fraud, and sought an accounting and declaratory relief.
The complaint alleged the following facts: Cronus is wholly owned by Howard Jon Colman, who also owns a 20 percent interest in Concierge. Westrec owns the remaining interest in Concierge and is affiliated with Westrec Contracting. Sachs is the chairman and chief executive officer of Concierge, and is also a principal in Westrec, as are Anderson and Robbins.
The complaint further alleges that in 1980, Colman operated a corporation named "Dew-All Services, Inc." (Dew-All) that managed homes at exclusive properties. In 1999, Sachs and Colman entered into a one-year trial relationship during which Colman provided home management services for Westrec at its Lake Las Vegas project. At the end of the one-year period, Westrec participated in the formation of Concierge, and Colman sold Dew-All to Concierge. Colman continued to provide services through Concierge in a complex transaction involving six agreements, four of which contain arbitration clauses.[1] Problems arose following the execution of the agreements, and on January 29, 2002, Sachs fired Colman from his employment with Concierge.
After Cronus filed its complaint, Colman and Cronus also submitted a demand for arbitration to the American Arbitration Association (AAA) under the arbitration clauses in the underlying agreements. On April 19, 2002, Concierge filed a cross-complaint against Colman and Cronus, as well as Nelson Colman, Colman's father, and Desert Home Services, Inc. (Desert), which is operated by Nelson Colman.
The cross-complaint asserts claims for breach of contract, fiduciary fraud, unjust enrichment, and inducement of breach of contract, and seeks an accounting and declaratory relief. It refers to five of the six agreements identified in the complaint, and alleges that Colman and Cronus improperly diverted business from Concierge to Nelson Colman and Desert, who were unjustly enriched by this conduct.
On May 6, 2002, Colman and Cronus filed a petition to stay the litigation and to compel arbitration. They stated that they had already demanded arbitration, and contended that five of the cross-claims implicated agreements containing an arbitration clause.
*387 On May 9, 2002, respondents filed motions under Code of Civil Procedure section 1281.2, subdivision (c),[2] to consolidate the arbitration proceeding with the underlying action, and to enjoin arbitration pending the outcome of this action. They contended that permitting the arbitration proceeding and underlying action to proceed risked inconsistent results, and that the underlying action involved nonarbitrable issues whose resolution might render arbitration unnecessary. In response, Cronus and Colman argued, inter alia, that although the underlying agreements identify California law as governing law, the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.) precluded application of section 1281.2 because the pertinent arbitration clauses specifically invoke the FAA.
Following the hearing, the trial court determined that (1) some of the causes of action and controversies in the underlying action were not subject to arbitration, (2) only three of the cross-claims were arbitrable, and (3) some of the litigants were not parties to agreements containing an arbitration agreement. On June 14, 2002, it denied the petition to compel arbitration and to stay the litigation, enjoined arbitration, and consolidated the three arbitrable cross-claims with the action "for all purposes ...." This appeal followed.

DISCUSSION
Appellants' sole contention is that under the circumstances of this case, the FAA precluded the application of section 1281.2, subdivision (c) (section 1281.2(c)). In our view, they are mistaken.
Subparts (1) and (4) of section 1281.2(c) permit a trial court to "refuse to enforce the arbitration agreement" or "stay arbitration pending the outcome of the court action" if it determines that "[a] party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact." Rulings on these matters are consigned to the trial court's discretion. (Henry v. Alcove Investment, Inc. (1991) 233 Cal.App.3d 94, 101, 284 Cal.Rptr. 255.)[3]
As our Supreme Court observed in Rosenthal v. Great Western Fin. Securities Corp. (1996) 14 Cal.4th 394, 405-410, 58 Cal.Rptr.2d 875, 926 P.2d 1061 (Rosenthal), the procedures that the FAA imposes on federal courts resemble California law in many respects. Thus, the FAA and California law (§ 1281.2, subd. (c)(3)) alike provide that "when a court has ordered arbitration of a controversy, any pending litigation on the same controversy is to be stayed." (14 Cal.4th at pp. 406-407, 58 Cal.Rptr.2d 875, 926 P.2d 1061, fn. omitted.) However, the FAA lacks any provision similar to section 1281.2(c), insofar as it authorizes the trial court to deny or stay arbitration pending completion of related litigation. (14 Cal.4th at p. 407, fn. 5, 58 Cal.Rptr.2d 875, 926 P.2d 1061.)
The focus of this appeal is section 2 of the FAA (9 U.S.C. § 2), which provides that an arbitration clause in a "contract evidencing a transaction involving commerce" is enforceable, "save upon such grounds as exist at law or in equity for the *388 revocation of any contract." (Italics added.) Appellants' central contention is that section 2 of the FAA precluded the trial court from enjoining arbitration under section 1281.2(c).
As we elaborate below (see pt. A, ante), although section 2 of the FAA establishes a broad principle of enforceability regarding arbitration agreements subject to the FAA, it permits parties to such agreements to bind themselves to the application of section 1281.2(c). In view of these principles, appellants contend that (1) the arbitration clauses at issue, properly understood, do not authorize the application of section 1281.2(c), and (2) section 2 of the FAA precludes the operation of section 1281.2(c) absent such contractual authorization. For reasons that we explain below (see pts. B & C, ante), we accept (1) but reject (2), and thus conclude that appellants' contention fails.

A. Governing Principles

A complex body of case authority has evolved regarding when the terms of an arbitration agreement subject to the FAA permit the operation of state laws that regulate or otherwise affect arbitration. We recount this authority, with due emphasis on the role that section 1281.2(c) has played in its development.

1. Broad Principle of Enforceability Under Section 2 of the FAA

The central import of section 2 of the FAA is well established. This section "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA]." (Moses H. Cone Hospital v. Mercury Constr. Corp. (1983) 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765.) Thus, the FAA generally bars the application of a state lawwhether substantive or proceduralto prevent the enforcement of an arbitration agreement subject to the FAA, unless the state law meets the requirements of section 2 of the FAA.
As the United States Supreme Court stated in Southland Corp. v. Keating (1984) 465 U.S. 1, 10-11, 104 S.Ct. 852, 79 L.Ed.2d 1 (Southland): "We discern only two limitations on the enforceability of arbitration provisions governed by the [FAA]: they must be part of a written maritime contract or a contract `evidencing a transaction involving commerce' and such clauses may be revoked upon 'grounds as exist at law or in equity for the revocation of any contract.' We see nothing in the [FAA] indicating that the broad principle of enforceability is subject to any additional limitations under state law." (Fn. omitted, italics added.)
In Perry v. Thomas (1987) 482 U.S. 483, 492-493, footnote 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (Perry), the United States Supreme Court further explained this broad principle of enforceability: "[S]tate law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of [section 2 of the FAA]." (Italics omitted.)
Following Southland and Perry, the court in Energy Group, Inc. v. Liddington (1987) 192 Cal.App.3d 1520, 1525-1529, 238 Cal.Rptr. 202 (Energy Group) addressed whether section 2 of the FAA preempts a stay of arbitration under section 1281.2(c). In Energy Group, the underlying contract provided solely that any arbitration would *389 be held in California under AAA rules. (192 Cal.App.3d at p. 1523, fn. 3, 238 Cal. Rptr. 202.) When a dispute arose between the parties to the contract, some of these parties filed a petition to compel arbitration. (Id. at pp. 1523-1524, 238 Cal.Rptr. 202.) In response, the trial court stayed arbitration under section 1281.2(c) pending the outcome of related litigation involving a nonparty to the contract. (192 Cal. App.3d at pp. 1524-1525, 238 Cal.Rptr. 202.)
Citing Southland and Perry, the court in Energy Group reversed, concluding that "section 1281.2 has been preempted by the FAA if it is used in order to avoid or delay arbitration of a contract dispute governed by the FAA." (Energy Group, supra, 192 Cal.App.3d at p. 1528, 238 Cal.Rptr. 202.) The Energy Group court reasoned that section 1281.2(c) was not generally applicable to contracts, but applied "only to contracts subject to arbitration," and its effects were indistinguishable from an order denying the petition. (192 Cal.App.3d at p. 1528, 238 Cal.Rptr. 202.)

2. Incorporation of State Law Into Arbitration Agreement

Notwithstanding the broad principle of enforcement found in section 2 of the FAA, parties may incorporate state arbitration laws into an arbitration agreement without offending the FAA. This matter was first clarified in Volt Info. Sciences v. Leland Stanford Jr. U. (1989) 489 U.S. 468, 470, 109 S.Ct. 1248, 103 L.Ed.2d 488 (Volt), which also concerned an application of section 1281.2(c).
In Volt, the underlying contract, which concerned the installation of an electrical system on the Stanford University campus, contained an arbitration clause and a choice-of-law provision stating that the contract "`shall be governed by the law of the place where the Project is located.'" (Volt, supra, 489 U.S. at p. 470, 109 S.Ct. 1248.) After a contract dispute arose, Stanford University successfully obtained a stay of arbitration under section 1281.2(c) pending the resolution of related litigation involving parties not bound by the contract. (489 U.S. at pp. 470-471, 109 S.Ct. 1248.) A state appellate court affirmed, concluding that the choice-of-law provision incorporated California's rules of arbitration into the contract. (Id. at p. 474, 109 S.Ct. 1248.)
The court in Volt accepted this construction of the choice-of-law provision as the resolution of a question of state law, and held that the FAA did not bar the operation of section 1281.2(c) because the parties had agreed that California's arbitration laws would govern their arbitration. (Volt, supra, 489 U.S. at pp. 474-476, 109 S.Ct. 1248.) The Volt court stated: "There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." (Id. at p. 476, 109 S.Ct. 1248.) Noting that California's arbitration rules, including section 1281.2(c), "generally foster the federal policy favoring arbitration," the court reasoned that interpreting the choice-of-law provision to make such rules applicable did not offend any policy embodied in the FAA. (489 U.S. at p. 476 & fn. 5, 109 S.Ct. 1248.)
The Volt court further explained: "The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration. [Citation.] But even when Congress has not completely displaced state regulation in an area, state law may nonetheless be pre-empted to the extent that it actually conflicts with federal lawthat is, to the extent that it `stands as an obstacle to the accomplishment and execution of the full *390 purposes and objectives of Congress.' [Citation.] The question before us, therefore, is whether application of [section 1281.2(c)] to stay arbitration under this contract in interstate commerce, in accordance with the terms of the arbitration agreement itself, would undermine the goals and policies of the FAA. We conclude that it would not." (Volt, supra, 489 U.S. at pp. 477-478, 109 S.Ct. 1248.)
As the United States Supreme Court subsequently concluded in Doctor's Associates, Inc. v. Casarotto (1996) 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (Doctor's Associates), Volt does not modify the broad principle of enforceability stated in Southland and Perry. Doctor's Associates addressed a Montana statute that rendered an arbitration clause unenforceable unless notice of the arbitration clause was stated on the first page of the underlying contract. (Id. at p. 683, 116 S.Ct. 1652.) The Montana Supreme Court concluded that section 2 of the FAA did not preempt this statute, reasoning that Volt had displaced Southland and Perry, and that under Volt, a state law was preempted only if it undermined the goals and policies of the FAA. (Id. at p. 685,116 S.Ct. 1652.)
The court in Doctor's Associates rejected the Montana Supreme Court's interpretation of Volt and reaffirmed Southland and Perry, stating: "Courts may not ... invalidate arbitration agreements under state laws applicable only to arbitration provisions. [Citations.] By enacting [section 2 of the FAA], ..., Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed `upon the same footing as other contracts.' [Citation.]" (Doctor's Associates, supra, 517 U.S. at p. 687, 116 S.Ct. 1652.) Applying this standard, the court held that the FAA displaced the Montana statute because it conditioned the enforcement of arbitration agreements on notice requirements restricted to arbitration agreements. (Id. at pp. 684-688,116 S.Ct. 1652.)
Following Volt, California courts have examined the underlying contract containing the arbitration clause to determine whether the parties agreed to the operation of section 1281.2(c). Thus, in Warren-Guthrie v. Health Net (2000) 84 Cal. App.4th 804, 808, 101 Cal.Rptr.2d 260 (Warren-Guthrie), the trial court denied a petition to compel arbitration under section 1281.2(c) due to the risk of conflicting rulings with the pending civil action. The court in Warren-Guthrie reversed, reasoning that the pertinent contract did not allow application of section 1281.2(c) because it provided that California law would govern the manner in which arbitration would be conducted, but not that California law would determine when arbitration was required. (84 Cal.App.4th at pp. 814-816,101 Cal.Rptr.2d 260.)
By contrast, in Mount Diablo Medical Center v. Health Net of California, Inc. (2002) 101 Cal.App.4th 711, 716, 722-725, 124 Cal.Rptr.2d 607, the underlying contract contained a broad choice-of-law provision stating that California law governed the "`validity, construction, interpretation and enforcement'" of the contract, and the court held that this provision permitted the operation of section 1281.2(c).

B. Interpretation of Underlying Arbitration Agreements

We now turn to the first issue presented by appellants' contention, namely, the extent to which the underlying contracts incorporate section 1281.2(c) through their terms. In view of the aforementioned authority, we examine the pertinent contracts, which involve interstate *391 commerce,[4] to determine whether they permit the application of section 1281.2(c).
The transaction underlying the complaint, cross-complaint, and demand for arbitration involved six contracts: (1) a limited liability company agreement between Cronus and Westrec creating Concierge; (2) a stock purchase agreement by which Colman transferred Dew-All's stock to Concierge; (3) an employment agreement between Colman and Concierge; (4) a covenant not to compete and confidentiality agreement between Colman and Concierge; (5) a consulting agreement between Cronus and Concierge; and (6) a guaranty agreement between Westree and Colman.
The limited liability company agreement and guaranty agreement do not contain arbitration provisions. Regarding the remaining contracts, the key arbitration clause is found in the stock purchase agreement.
The stock purchase agreement provides in section 9.10 for the arbitration of "[a]ny controversy, dispute or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of [the] Agreement, including any claim based on contract, tort or statute...." Section 9.10 further provides: "The designation of a situs or specifically a governing law for this agreement or the arbitration shall not be deemed an election to preclude application of the Federal Arbitration Act, if it would be applicable." (Italics added.) Regarding governing law, section 9.1 of the stock purchase agreement states: "Construction. This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of California, without giving effect to the conflict of laws provisions thereof."
The employment agreement, covenant not to compete, and consulting agreement expressly state that disputes shall be settled or resolved in accordance with section 9.10 of the purchase agreement. Like the stock purchase agreement, the employment agreement and covenant not to compete also provide that they shall be interpreted and performed or enforced in accordance with California law, without reference to its laws concerning conflicts of laws.
Because all the arbitration clauses are tied to the arbitration clause in the stock purchase agreement, the key issue concerns the interpretation of the latter clause. We therefore examine the language of this clause and related provisions under the canons of contract interpretation to determine the intent of the parties. (Warren-Guthrie, supra, 84 Cal.App.4th at p. 814, 101 Cal.Rptr.2d 260; see Mount Diablo Medical Center v. Health Net of California, Inc., supra, 101 Cal.App.4th at p. 722, 124 Cal.Rptr.2d 607.) When, as here, no extrinsic evidence was submitted regarding the interpretation of the contracts, our inquiry is de novo. (Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865, 44 Cal.Rptr. 767, 402 P.2d 839; Warren-Guthrie, supra, 84 Cal.App.4th at p. 814,101 Cal.Rptr.2d 260.)
*392 In the present case, the stock purchase agreement contains a broad and general choice-of-law provision, but expressly provides within the arbitration clause that any such choice of law does not displace the FAA, "if it would be applicable." Because specific contractual provisions supercede general provisions on the same subject (National Ins. Underwriters v. Carter (1976) 17 Cal.3d 380, 384, 131 Cal.Rptr. 42, 551 P.2d 362; Ticor Title Ins. Co. v. Rancho Santa Fe Assn. (1986) 177 Cal.App.3d 726, 730, 223 Cal.Rptr. 175), we conclude that the parties to the stock purchase agreement intended the FAA would apply to the fullest extent to that agreement. In turn, this conclusion extends to the employment agreement, covenant not to compete, and consulting agreement, which incorporate the arbitration clause of the stock purchase agreement by reference.
Because the parties agreed that the FAA would govern their arbitration without limitation, their arbitration agreements lack the sort of special authorization for the application of section 1281.2(c) discussed in Volt. Instead, their agreements effectively consign the determination regarding the applicability of state law including section 1281.2.(c)affecting the enforceability of the arbitration agreements to the standard found in section 2 of the FAA, which preempts all such laws except those based upon "grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.)

C. Preemption

We therefore address the second issue presented by appellants' contention: does section 1281.2(c) invoke grounds for denying or delaying enforcement applicable to any contract? On this matter, appellants direct our attention to Energy Group and Warren-Guthrie, which support the proposition that section 2 of the FAA bars the operation of section 1281.2(c) absent the special contractual authorization found in Volt. For reasons that we explain below, we conclude that Energy Group and Warren-Guthrie are wrongly decided.
As we have indicated (see pts. A. & B., post), the standard for resolving the issue before us is stated in Southland, Perry, and Doctor's Associates. Under section 2 of the FAA, a state law affecting enforceability is displaced unless it "arose to govern issues concerning the validity, revocability, and enforceability of contracts generally" (Perry, supra, 482 U.S. at p. 492, fn. 9, 107 S.Ct. 2520), and it does not single out arbitration agreements for "suspect status" or unequal treatment (Doctor's Associates, supra, 517 U.S. at p. 687, 116 S.Ct. 1652). Because Volt concerned section 1281.2(c) but did not address the issue before us,[5] we turn to our Supreme *393 Court for guidance in applying the standard at issue to section 1281.2(c).
In Rosenthal, supra, 14 Cal.4th at pages 405-410, 58 Cal.Rptr.2d 875, 926 P.2d 1061, our Supreme Court addressed whether sections 1281.2 and 1290.2, which authorize the trial court to resolve factual questions about the enforcement of arbitration agreements without a jury trial, is preempted by the FAA, which permits a jury trial when these matters are raised in federal district court (9 U.S.C. § 4). The court in Rosenthal held that the FAA did not preempt these state procedures. (14 Cal.4th at pp. 405-410, 58 Cal.Rptr.2d 875, 926 P.2d 1061.)
Turning first to general principles regarding the supremacy of federal law, the Rosenthal court reasoned that the procedures in question escaped preemption because they were not hostile to the FAA, and the FAA did not expressly impose its procedures regarding jury trials on state courts. (Rosenthal, supra, 14 Cal.4th at p. 409, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) Furthermore, the court determined that these procedures escaped displacement under section 2 of the FAA, even though they are not generally applicable to contracts, reasoning that they neither constitute a "special rule of nonenforceability applicable only to arbitration agreements" nor place such agreements "at a disadvantage compared to other contracts...." (14 Cal.4th at p. 410, 58 Cal.Rptr.2d 875, 926 P.2d 1061.)
Again, in Little v. Auto Stiegler, Inc. (2003) 29 Cal.4th 1064, 1081-1085, 130 Cal. Rptr.2d 892, 63 P.3d 979 (Little), our Supreme Court held that the minimal procedural requirements imposed on the arbitration of claims under the California Fair Employment and Housing Act (FEHA) (Gov.Code, § 12900 et seq.) in Armendariz v. Foundation Health Psychcare Services, Inc. (2000) 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, also apply to the arbitration of wrongful discharge claims asserted under Tameny v. Atlantic Richfield Co. (1980) 27 Cal.3d 167, 178, 164 Cal.Rptr. 839, 610 P.2d 1330.[6] On this matter, the *394 court in Little reasoned that the Armendariz requirements arise from the nonwaivability of FEHA claims, and thus they extend to Tameny claims, which are similarly nonwaivable. (Little, supra, 29 Cal.4th at pp. 1076-1078, 130 Cal.Rptr.2d 892, 63 P.3d 979.)
In reaching this conclusion, the Little court rejected the contention that section 2 of the FAA preempts the Armendariz requirements with respect to arbitration agreements subject to the FAA. (Little, supra, 29 Cal.4th at pp. 1079-1081, 1084, 130 Cal.Rptr.2d 892, 63 P.3d 979.) It acknowledged that these requirements apply only to arbitration agreements, but determined that "they do not do so out of a generalized mistrust of arbitration per se...." (Id. at p. 1079, 130 Cal.Rptr.2d 892, 63 P.3d 979.) Furthermore, it concluded that these requirements were "applications of general state law contract principles regarding the unwaivability of public rights to the unique context of arbitration. ..." (Ibid.)
We therefore examine whether the provisions of section 1281.2(c) at issue stem from "general state law contract principles" (Little, supra, 29 Cal.4th at p. 1079, 130 Cal.Rptr.2d 892, 63 P.3d 979), and do not place arbitration agreements "at a disadvantage compared to other contracts" (Rosenthal, supra, 14 Cal.4th at p. 410, 58 Cal.Rptr.2d 875, 926 P.2d 1061). In observing that California's arbitration laws generally foster the goals of the FAA, the Volt court noted that the FAA lacks a provision similar to section 1281.2(c) "to deal with the special practical problems that arise in multiparty contractual disputes when some or all of the contracts at issue include agreements to arbitrate," and it indicated that in enacting section 1281.2(c), "California has taken the lead in fashioning a legislative response to this problem...." (Volt, supra, 489 U.S. at p. 476, fn. 5, 109 S.Ct. 1248.)
In our view, section 1281.2(c), as applied here, represents an evenhanded application of state principles addressing the general problem of multiple litigation, and thus it avoids preemption under section 2 of the FAA. As a rule, once an action is filed and assigned to a state superior court, the court in question acquires priority of jurisdiction over the matter with respect to other state superior courts. (Glade v. Glade (1995) 38 Cal.App.4th 1441, 1449-1450, 45 Cal.Rptr.2d 695.) Nonetheless, this principle, by itself, is sometimes insufficient to prevent a multiplicity of suits involving common questions of law and fact. (See id. at p. 1455, 45 Cal.Rptr.2d 695.)
In the absence of other remedies such as consolidation, an injunction is properly granted "[w]here the restraint is necessary to prevent a multiplicity of judicial proceedings." (§ 526, subd. (a)(6); Civ. Code, § 3423, subd. (a); Advanced Bionics Corp. v. Medtronic, Inc. (2002) 29 Cal.4th 697, 704-708, 128 Cal.Rptr.2d 172, 59 P.3d 231.) As our Supreme Court observed long ago, "[t]he courts of this state have the same power to restrain persons within the state from prosecuting actions in either domestic or foreign jurisdictions which courts of equity have elsewhere." (Spreckels v. Hawaiian Com. etc. Co. (1897) 117 Cal. 377, 378, 49 P. 353; see Advanced Bionics Corp. v. Medtronic, Inc., supra, 29 Cal.4th at pp. 704-705, 128 Cal.Rptr.2d 172, 59 P.3d 231.) The issuance of such an injunction is consigned to the trial court's discretion. (Aldrich v. Transcontinental *395 Land etc. Co. (1955) 131 Cal.App.2d 788, 797, 281 P.2d 362.)
Under suitable circumstances, this equitable remedy may be invoked to stay judicial proceedings arising before or after the action in which the injunction is demanded. (Glade v. Glade, supra, 38 Cal.App.4th at p. 1455, 45 Cal.Rptr.2d 695; § 526, subd. (b)(1).) In a variety of contexts, including contractual disputes involving multiple parties and separate but related actions, injunctions have been properly issued to stay litigation in all but one action, pending resolution of the key matters. (Fidelity & Deposit Co. v. Santa Monica Finance Co. (1960) 182 Cal.App.2d 211, 212-217, 6 Cal. Rptr. 213; Aldrich v. Transcontinental Land etc. Co., supra, 131 Cal.App.2d at pp. 796-797, 281 P.2d 362; see 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, §§ 312-313, pp. 406-408.)
"A proceeding to compel arbitration is in essence a suit in equity to compel specific performance of a contract. (Freeman v. State Farm Mut. Auto. Ins. Co. (1975) 14 Cal.3d 473 [121 Cal.Rptr. 477, 535 P.2d 341] Accordingly, equitable principles come into play...." (Weisman v. Johnson (1982) 133 Cal.App.3d 289, 295, 183 Cal.Rptr. 792.) Thus, when, as here, parties to an action seek to compel arbitration and the action involves third parties and matters not subject to arbitration, the trial court isin effectasked in equity to order partial resolution of the controversy in another (albeit contract-based) forum, thereby setting up the possibility of duplicative proceedings and conflicting rulings.
In permitting the trial court to stay arbitration pending the outcome of the court action, even though this may result in rulings on arbitrable issues, section 1281.2(c) applies to the unique context of arbitration the general equitable principles described above regarding the regulation of multiple proceedings. Furthermore, as the Volt court indicated, section 1281.2(c) is not hostile to the goals and policies of the FAA, but constitutes a leading solution to the problems of multiple litigation, as they arise within the context of arbitration. (Volt, supra, 489 U.S. at p. 476, fn. 5, 109 S.Ct. 1248.) Accordingly, section 2 of the FAA does not bar the operation of the provisions of section 1281.2(c) at issue here.
We thus decline to follow Energy Group and Warren-Guthrie. In each case, the court concluded that section 2 of the FAA displaces section 1281.2(c) solely because it constitutes a special rule for arbitration, without examining the roots of this rule. (Energy Group, supra, 192 Cal.App.3d at p. 1528, 238 Cal.Rptr. 202; Warren-Guthrie, supra, 84 Cal.App.4th at p. 811, 101 Cal. Rptr.2d 260.) Our inquiry into this matter, under the guidance of Rosenthal and Little, dictates a contrary conclusion.
In sum, the trial court properly stayed arbitration pending the outcome of the court action.

DISPOSITION
The order of the trial court is affirmed.
We concur: EPSTEIN, Acting P.J., and HASTINGS, J.
NOTES
[1] As we explain further below (see Discussion, pt. C, post), three of four agreements containing arbitration clauses incorporate by reference the terms relevant to arbitration found in a fourth agreement, namely, the stock purchase agreement.

The latter agreement states in section 9.1: "Construction. This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of California, without giving effect to the conflict of laws provisions thereof."
Regarding arbitration, section 9.10 of this agreement provides in pertinent part: "Agreement to Arbitrate. Any controversy, dispute or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of [the] Agreement, including any claim based on contract, tort or statute, shall be settled, at the request of either party, by arbitration conducted in Los Angeles, California in accordance with the then existing Rules for Commercial Arbitration of the American Arbitration Association (`AAA'), and judgment upon any award rendered by the arbitrator may be entered by any State or Federal court having jurisdiction thereof.... The designation of a situs or specifically a governing law for this agreement or the arbitration shall not be deemed an election to preclude application of the Federal Arbitration Act, if it would be applicable." (Italics added.)
[2] All further statutory citations are to the Code of Civil Procedure, unless otherwise indicated.
[3] Appellants do not contend that the trial court erred in staying the arbitration under section 1281.2(c) if it is not preempted by the FAA. We therefore do not address whether the ruling at issue here is an abuse of discretion under section 1281.2(c).
[4] Appellants submitted uncontradicted evidence that the contracts in question involve interstate commerce, namely, a declaration from Colman that Concierge conducted its business in California, Nevada, and Arizona. (Allied-Bruce Terminix Cos. v. Dobson (1995) 513 U.S. 265, 281, 115 S.Ct. 834, 130 L.Ed.2d 753 [transaction involves interstate commerce under FAA when there is "an interstate commerce connection," even if the parties to an arbitration agreement did not contemplate such a connection].) Respondents do not dispute that the contracts involve interstate commerce. Although the trial court did not make any express finding on this issue, we would not be bound by a finding that interstate commerce was not involved, given the unrebutted evidence to the contrary. (County of Santa Cruz v. McLeod (1961) 189 Cal.App.2d 222, 235, 11 Cal.Rptr. 249.)
[5] Appellants and respondents alike claim to find dispositive support in Volt for their respective positions on the issue before us. Appellants point to a brisk summary remark by the Volt court that enforcing state rules the parties have agreed upon comports with the FAA, "even if the result is that arbitration is stayed where the [FAA] would otherwise permit it to go forward." (Volt, supra, 489 U.S. at p. 479, 109 S.Ct. 1248.) By contrast, respondents point to the favorable remarks in Volt about California's arbitration laws. (Id. at p. 476 & fn. 5, 109 S.Ct. 1248.)

Although Volt contains remarks relevant to the issue before us (see our discussion in the text, ante), Volt does not resolve or discuss this issue. As the court in Volt expressly stated, it decided a distinct question, namely, whether the application of section 1281.2(c) to stay arbitration under the agreement before it, "in accordance with the terms of the arbitration agreement itself, would undermine the goals and policies of the FAA." (Volt, supra, 489 U.S. at pp. 477-478, 109 S.Ct. 1248, italics added; Doctor's Associates, supra, 517 U.S. at p. 687, 116 S.Ct. 1652.)
Furthermore, as the United States Supreme Court clarified in Doctor's Associates, the Volt court's favorable remarks regarding California's arbitration laws did not, in themselves, constitute a determination regarding the preemption standard found in section 2 of the FAA (see pt. B, ante). In our view, the Volt court's favorable remarks regarding California's arbitration laws were intended to establish that parties may agree to abide by them without offending the FAA.
For similar reasons, we reject respondents' contention that the court in Doctor's Associates embraced respondents' view of Volt regarding the issue before us. This contention rests on the following remarks in Doctor's Associates, supra, 517 U.S. at page 688, 116 S.Ct. 1652: "Volt involved an arbitration agreement that incorporated state procedural rules, one of which, on the facts of that case, called for arbitration to be stayed pending the resolution of a related judicial proceeding. The state rule examined in Volt determine only the efficient order of proceedings; it did not affect the enforceability of the arbitration agreement itself. We held that applying the state rule would not `undermine the goals and policies of the FAA,' [citation], because the very purpose of the [FAA] was to `ensur[e] that private agreements to arbitrate are enforced according to their terms,' [citation]." (Italics added.) However, this terse description of Volt comports with our view of the limited issues presented and resolved in Volt.
[6] In Armendariz, the court imposed the following requirements on arbitration agreements governing FEHA claims: (1) the agreement may not limit statutorily imposed remedies (24 Cal.4th. at p. 103, 99 Cal. Rptr.2d 745, 6 P.3d 669); (2) it should permit adequate discovery (id. at pp. 104-106, 99 Cal.Rptr.2d 745, 6 P.3d 669); (3) it should require the arbitrator to issue a written decision "that will reveal, however briefly, the essential findings and conclusions on which the award is based" (id. at p. 107, 99 Cal.Rptr.2d 745, 6 P.3d 669); and (4) it cannot "require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court" (id. at pp. 110-111, 99 Cal.Rptr.2d 745, 6 P.3d 669).